**STAR BANK NATIONAL ASSOCIATION, Appellee,**

**v.**

**CIRROCUMULUS LIMITED PARTNERSHIP et al., Appellants.**

[Cite as *Star Bank Natl. Assn v. Cirrocumulus Ltd. Partnership* (1997), 121 Ohio App.3d 731.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 70918 and 70919.

Decided July 28, 1997.

732

734

*Diane Thimmig* and *William J. Stavole,* for appellees.

*Reminger & Reminger, Nicholas D. Satullo* and *Laura M. Sullivan,* for appellant.

HOLMES, Judge.

This appeal arises from a judgment of the Cuyahoga County Court of Common Pleas, which found in favor of the plaintiff-appellee, Star Bank, against defendants-appellants, Cirrocumulus Limited Partnership and Radio Parts Company,

for sums owed to Star Bank on two instruments and awarded prejudgment interest to the plaintiff-appellee. Defendants-appellants timely appeal the judgments of the trial court made final by the denial of the motion for judgment notwithstanding the verdict and/or new trial and the grant of plaintiff-appellee's motion for prejudgment interest. This court has consolidated these appeals for record, briefing, hearing, and disposition.

# I

The facts giving rise to this appeal are as follows. In February 1990, Cumulus Corporation, a nonparty to this action, entered into a Financing and Security Agreement with Star Bank. This agreement gave Star Bank a security interest in substantially all of Cumulus Corporation's assets. In the fall of 1992, due to certain business reversals, and upon the advice of Star Bank, Cumulus hired an outside "crisis manager" to assist in its management. A decision was made to sell the divisions of Cumulus to maximize its assets. At this time, while the value of Cumulus's memory module business was rapidly declining, key employees were leaving and its customer base was eroding. Cumulus negotiated the sale of its Memory Module Division to appellant Cirrocumulus Limited Partnership ("Cirrocumulus"). During the negotiations for the sale, Cirrocumulus was provided with a "pro forma" sales list and the opportunity to conduct its own "due diligence." It is undisputed that Cumulus made no representations to Cirrocumulus that it would make a certain profit.

On October 9, 1992, Cirrocumulus executed and delivered to Cumulus the asset purchase agreement by which Cumulus transferred the assets, excluding the inventory, used in its memory module business to Cirrocumulus for $450,000. Pursuant to the terms of this agreement, Cirrocumulus was obligated to pay to Cumulus a noncompetition and consulting fee, the amount equal to one percent of the module sales each month. The aggregate noncompetition and consulting fee to be paid during the period from November 1, 1992 to October 31, 1993 was guaranteed by Cirrocumulus not to be less than $250,000, with monthly payments due on the last Friday of each month. On October 14, 1992, Cumulus assigned all of its rights, title, and interest in the asset purchase agreement and promissory note to Star Bank.

Cirrocumulus exercised its right under the asset purchase agreement to purchase from Cumulus some memory module inventory. On November 4, 1992, Cirrocumulus executed a promissory note in favor of Cumulus in the amount of $326,309 in exchange for the inventory set forth in a general assignment and bill of sale executed by Cumulus on November 3, 1992. The note was further modified on November 6, 13, and 20, with the cost of the inventory and the promissory note ultimately to be $612,227. Collectively, the promissory note and

the three note-modification agreements are referred to as the "promissory note." Each of the general assignments and bills of sale pertaining to the sale of inventory specifically states that "the Inventory is being sold 'AS IS, WHERE IS' WITHOUT ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY." (Emphasis *sic.*)

Pursuant to the terms of the promissory note, Cirrocumulus became obligated to pay Star Bank the principal sum of the promissory note in weekly installments of $25,000, to begin November 4, 1992, and, pursuant to the terms of the asset purchase agreement, Cirrocumulus was obligated to pay the noncompetition and consulting fee to Star Bank on a monthly basis.

On October 14, 1992, appellant Radio Parts Company ("RPC") executed and delivered to Cumulus a guaranty in which it guaranteed payment to Cumulus of any debt owed to Cumulus by Cirrocumulus pursuant to both the promissory note and the noncompetition and consulting fee.

When Cirrocumulus began to operate its newly purchased Memory Module division, it was informed by Cumulus's largest customer, Business Land, that it was owed $1,250,000 in overdue rebates. Until this notification from the customer, Cirrocumulus was unaware that such a rebate program existed. Although Cirrocumulus believed it could not reestablish the business with Business Land without absorbing this rebate program, it believed that a rebate program of such a magnitude would reduce the profit margin of the memory module business by one-half and, therefore, declined to absorb the program. Further, Cirrocumulus determined that, upon inspection, $44,500 worth of the inventory that it purchased was defective. Finally, Cirrocumulus claimed that the value of some items of inventory purchased had been miscalculated, resulting in a $20,000 discrepancy in the amount due on the promissory note. Cirrocumulus stopped making payments on the promissory note and failed to pay the minimum on the noncompetition and consulting agreement. A balance of $208,247.17 remains due on the noncompetition and consulting agreement, and, pursuant to the terms of the promissory note, $282,244.33 plus ten percent interest remains to be paid.

Star Bank brought this action against both Cirrocumulus and RPC in a four-count complaint, alleging in Count I that Cirrocumulus owed the principal sum of $282,244.33 on the promissory note, in Count II that Cirrocumulus owed royalty fees on the noncompetition and consulting agreement of not less than $250,000, in Count III that RPC owed $282,244.33 pursuant to its guaranty of the note, and in Count IV that RPC owed not less than the $250,000 minimum on the royalty fee pursuant to the guaranty on the noncompetition and consulting agreement.

Appellants Cirrocumulus and RPC jointly counterclaimed against Star Bank for recoupment of the value of the allegedly defective inventory purchased and the alleged $20,000 clerical mistake made on the value of the promissory note,

claiming that their obligations under these contracts had been procured by negligent and/or intentional representation or fraud in the inducement and, further, that there had been breaches of contract by Cumulus and a failure of consideration. Cirrocumulus also asserted that Star Bank is not a holder in due course of the note and, hence, is subject to the same claims and defenses as the assignor, Cumulus.

Star Bank moved for summary judgment on each of its claims. The trial court granted partial judgment to Star Bank on Count I of its complaint for the amount of $214,244.33 on the promissory note, this amount not being subject to the recoupment claims of Cirrocumulus.

The remaining issues went to jury trial. At trial, Star Bank presented testimony from Dr. Alpert and Steven Keiffner. Alpert, the founder and owner of Cumulus Corporation, testified that he and his wife began Cumulus in 1987 and built it into a business doing business of $116 million by 1991, about $40 million attributable to its memory module business. He stated that it was common practice in this business to give rebates or volume discounts to customers. Star Bank was Cumulus's lender and provided loans on an asset-based lending arrangement. Cumulus's available credit was based upon a formula that was applied to the value of Cumulus's assets, which included its receivables. Alpert testified that, due to business reversals in the summer of 1992, Cumulus had cash flow problems and was unable to borrow additional funds from Star Bank. As a condition of borrowing additional funds to meet its payroll, Cumulus was required by Star Bank to hire a crisis manager to assist in the management and preservation of assets. Star Bank provided the names of three potential management companies; Cumulus hired one of the suggested companies, Glass and Associates. George Benson, an independent contractor working through Glass and Associates, took primary responsibility for the management of the assets of Cumulus. A decision was made to sell the Memory Module Division to maximize the assets. Cumulus negotiated with two other prospective purchasers of the company, Centon and PNY, but Cirrocumulus ultimately was the purchaser. Each prospective purchaser conducted its own "due diligence." No records or employees were off limits during the due diligence review. Alpert stated that he made no guarantees to Cirrocumulus that it would succeed in this business. Further, he stated that he made no representations that the inventory was new and, in fact, there was used inventory in the warehouse. He made no express warranties with respect to the inventory sold to Cirrocumulus. Alpert had no knowledge that Cirrocumulus would try to claim that some of the inventory was defective, and he had no knowledge of any other defense that Cirrocumulus was going to raise with respect to the contract, promissory note or the guaranty. In mid-January of 1993, Cumulus filed for bankruptcy.

Steven Keiffner of Star Bank testified that Cumulus and Star Bank had entered into a business-borrowing association in November 1990. Cumulus had an asset-based loan, which is backed by the receivables of the company. Because of this, consent of Star Bank would be required if Cumulus conducted any sale outside the normal course of business. In May or June 1992, Cumulus's sales fell off and Cumulus defaulted under the terms of the loan agreement with Star Bank. To protect its interests, Star Bank conditioned additional advances or loans to Cumulus on the hiring of a crisis manager experienced in the industry. Keiffner stated that although he had previous experience with Glass and Associates, he did not know George Benson. Because Cirrocumulus was essentially a start-up company with no assets and no prior operations, Star Bank required a guaranty from the affiliate company, RPC, before it would consent to the sale. Keiffner testified that the principal balance due under the promissory note was $282,244.33. Although the last payment Cirrocumulus remitted was in March 1993, it brought the payments up to date only as of February 3, 1993. Star Bank has received no payment since March 1993 and has accelerated the balance due under the note. Keiffner testified that although the minimum guaranty on the royalty payments due for the year was $250,000, Star Bank had received only one payment of $1,742.82, leaving a principal balance due of $248,257.17. Keiffner testified that the total unpaid balance due to Star Bank on the two instruments is $530,491.50.

Plaintiff rested its case. The defense called David Sceva, a former bank employee, and George Benson, the crisis manager who was in place to implement the cash flow plan, as if on cross-examination, and called Leonard Applebaum, partner in both Cirrocumulus and RPC, and Stewart Hamilton, one of the original partners of Cirrocumulus, who was responsible for the test equipment and inventory in the sale, on direct examination. The testimony of Shirley Ham, former employee of Cumulus, was presented by videotape recording.

David Sceva testified as if on cross-examination that Cumulus requested the consent of Star Bank to the sale of certain assets by Cumulus and Star Bank responded by citing the terms under which it would consent.

George Benson testified as if on cross-examination that he worked as an independent contractor for Glass and Associates as a crisis manager for Cumulus Corporation. His assignment was to carry out a cash flow plan that had been agreed upon by Cumulus and its lender, Star Bank. He testified that Cirrocumulus did conduct some due diligence before its purchase of Cumulus. He stated that the party with the final say regarding the sale of Cumulus's assets was, from a corporate standpoint, Dr. Alpert, but to secure the release of assets, the bank had to be informed and consent. Benson said he never made representations

that the inventory was new products or that Cirrocumulus could reach a specific profit level or that customers would continue to do business with it.

Leonard Applebaum testified that RPC is a family business started by his parents in 1931. He said that Cirrocumulus was formed for the purpose of acquiring the memory module business from Cumulus. He communicated with Dr. Alpert about the potential acquisition of Cumulus and was introduced to George Benson by Alpert. On cross-examination, he testified that he never met face-to-face with a representative of Star Bank during the negotiations. Applebaum said that Cirrocumulus was given sales reports, a pro forma sales list and customer lists for review prior to the sale, but it was months after the sale, in January 1993, when he first learned that there was a rebate program in place with respect to Cumulus's largest customer, Business Land. He stated that there was no indication of the rebate program in the reports that were given to him. When they conducted the due diligence, they interviewed the vice president of sales, operations manager, manufacturing manager, and quality control manager. Applebaum testified that nothing in those interviews placed doubt upon the documents on which they were relying. He stated that had Cirrocumulus known the profit structure of the company with the rebate program in place, it would have agreed to pay only less than half of the $1,362,000 price that it paid and would not have agreed to a minimum royalty of $250,000 or guaranteed those amounts through RPC. Applebaum said he notified Sceva at Star Bank in January 1993 that approximately $44,500 of inventory was unusable. He indicated that calculations were made in error on the costs of the inventory and amounted to an excess of $20,014.33 on the promissory note. He said he sent this documentation to Star Bank as a debit memo along with a check for the difference to satisfy one $25,000 royalty payment.

Applebaum stated that the Cirrocumulus business generated $18 million in sales in the past three years. He verified that the amount of the purchase price still outstanding on the instruments was $530,244. Further, Applebaum testified that on October 14, 1992, when the assignment was made from Cumulus to Star Bank, he had no knowledge of the defective inventory, he did not know that an adjustment was going to be made because of a mistake, and he did not know that he would have any claim for fraud.

Stuart Hamilton testified that he, Applebaum, and Michael Blumberg were the original investors in the Cirrocumulus Limited Partnership. Many meetings were held during the negotiation of the acquisition of Cumulus. Nothing in the documents that they reviewed indicated that a rebate program existed, but had he known about the rebate program, it would have affected his decision to buy Cumulus. Applebaum and Blumberg were responsible for the verification of

marketing, sales, and customer information, and Hamilton was responsible for the physical assets, engineering tools, and inventory.

The testimony of Shirley Ham was presented by videotape. She testified that she was the corporate credit manager at Cumulus Corporation and that at the time of the severe cash crunch in August or September 1992, there was a large receivable owing from Business Land to Cumulus. In the context of attempting to collect the aging accounts, she learned of the existence of the rebate program. She testified that she was surprised to learn that Cirrocumulus had purchased Cumulus in October 1992 because representatives of Cirrocumulus had not communicated with her during a due diligence review and she was the only person with information regarding the receivables. Both Centon and PNY, as prospective purchasers, had sent three representatives, who, as part of their due diligence procedure, reviewed the top ten accounts and reviewed hundreds of invoices, pulled inventory reports, and physically counted inventory on the floor. Ham testified that she had been instructed to give the prospective purchasers any documentation that they wished to see. She stated that if, after September 22, 1992, anyone had asked her about a rebate program, she would have told them of its existence.

The defense rested, closing arguments were made, and the matter was submitted to the jury. On December 27, 1995, the jury returned its verdict. By interrogatory, the jury determined that (1) Cirrocumulus and RPC failed to prove their claimed defense that Cumulus made false representations of a material fact relating to the transaction and that Cirrocumulus's injuries were proximately caused by their reliance on Cumulus's representation or concealment of a material fact and (2) Cirrocumulus and RPC failed to prove a claim for recoupment with respect to fraud, breach of warranty, or failure of consideration. The jury further found by interrogatory that (1) Star Bank was not too closely connected to the underlying transaction to claim the status of a holder in due course and (2) Star Bank took the promissory note in good faith and without notice that it was overdue or had been dishonored or that there was an uncured default with respect to payment of another note issued as part of the same series. The jury returned a general verdict in favor of Star Bank on its complaint against both Cirrocumulus and RPC for $530,244.33.

On January 5, 1996, Star Bank moved the court for prejudgment interest. On the same day, Cirrocumulus and RPC filed a motion for judgment notwithstanding the verdict and/or a new trial, which was denied. On June 26, 1996, the court granted Star Bank's motion for prejudgment interest against both Cirrocumulus and RPC. This appeal follows.

In this consolidated appeal in case No. 70918, appellants advance as error for our review the eleven errors as claimed in their motion for judgment notwith-

standing the verdict and/or new trial, and in case No. 70919, appellants challenge the lower court's grant of prejudgment interest and the amount awarded.

## II

Appellants' thirteen assignments of error are as follows.

"Assignment of Error No. I

"The Trial Court's failure to cure the misconduct of appellee's counsel during rebuttal, relating to her repeated references, over appellants' objection, that appellants had 'made' $18 million, was prejudicial error.

"Assignment of Error No. II

"The Trial court erred in failing to instruct the jury to disregard all evidence relating to 'as is' disclaimers.

"Assignment of Error No. III

"The trial court erred in adopting appellee's proposed jury instructions November 25, relating to disclaimer of express warranty, thereby charging the jury to consider irrelevant and prejudicial matters.

"Assignment of Error No. IV

"The trial court committed prejudicial error in its reading of the charge regarding disclaimer to the jury because the instructions, as read, were inherently confusing, inconsistent, and contrary to law.

"Assignment of Error No. V

"The trial court erred in refusing to grant judgment notwithstanding the verdict regarding the portion of appellants' recoupment claim relating to defective inventory because appellants are entitled to recoupment in this amount as a matter of law.

"Assignment of Error No. VI

"The trial court's instructions regarding warranty and disclaimer constitutes [*sic*] prejudicial error because the instructions included irrelevant matters which were confusing and patently harmful to the appellants.

"Assignment of Error No. VII

"In the alternative, the jury's determination that there was not a breach of express warranty is not sustained by the weight of the evidence and is contrary to law and the trial court erred in refusing to grant a new trial on this issue.

"Assignment of Error No. VIII

"The trial court's refusal to grant judgment notwithstanding the verdict regarding $20,000 of the appellants' recoupment claim was error because appellants are entitled to recoupment in this amount as a matter of law.

"Assignment of Error No. IX

"In the alternative, the jury's determination that there was not a clerical error is not sustained by the weight of the evidence and is contrary to law, and the trial court erred in refusing to grant a new trial on this issue.

"Assignment of Error No. X

"The trial court erred in denying defendants' motion for judgment notwithstanding the verdict regarding the appellees' [sic] holder in due course status because, after construing the evidence most strongly in favor of appellee, reasonable minds could only come to the conclusion that appellee is not a holder in due course.

"Assignment of Error No. XI

"In the alternative, the jury's determination that appellee is holder in due course is not sustained by the weight of the evidence and is contrary to law, and the trial court erred in refusing to grant a new trial on this issue.

"Assignment of Error No. XII

"The court erred in granting prejudgment interest because the parties were not in privity of contract.

"Assignment of Error No. XIII

"In the alternative, the trial court erred in calculating the amount of prejudgment interest awarded."

### III

Each of appellants' first eleven assigned errors was presented to the court below in appellants' motion for judgment notwithstanding the verdict and/or motion for a new trial. The motion was denied by the trial court. Accordingly, we review the lower court's denial of appellants' motion in assigned errors one through eleven.

A motion for a judgment notwithstanding the verdict is governed by Civ.R. 50(B).

"The applicable standard of review to appellate challenges to the overruling of motions for judgment notwithstanding the verdict is identical to that applicable to

motions for a directed verdict. *Posin v. ABC Motor Court Hotel* (1976), 45 Ohio St.2d 271, 74 O.O.2d 427, 344 N.E.2d 334. A motion for a judgment notwithstanding the verdict pursuant to Civ.R. 50(B) tests the legal sufficiency of the evidence. *Brooks v. Brost Foundry Co.* (May 2, 1991), Cuyahoga App. No. 58065 [unreported], 1991 WL 69341. 'A review of the trial court's denial of appellant's motion for a directed verdict and motion for judgment notwithstanding the verdict requires a preliminary analysis of the components of the action * * *.' *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 13, 531 N.E.2d 333, 337." *McKenney v. Hillside Dairy Co.* (1996), 109 Ohio App.3d 164, 176, 671 N.E.2d 1291, 1298–1299; see, also, *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511, 514–515.

■ A motion for judgment notwithstanding the verdict should be denied when a court, construing the evidence most strongly in favor of the party against whom the motion was made, determines that there is substantial evidence to support the nonmoving party's position upon which reasonable minds could differ. *Filkins v. Cales* (1993), 86 Ohio App.3d 61, 619 N.E.2d 1156.

However, a motion for a new trial is governed by Civ.R. 59, which permits a new trial to be granted on the following grounds:

"(1) Irregularity in the proceedings of the court, jury, referee, or prevailing party, or any order of the court or referee, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

"(2) Misconduct of the jury or prevailing party;

"* * *

"(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

"(7) The judgment is contrary to law;

"* * *

"In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown."

■ It is well established that a trial court's decision whether to grant a new trial lies within the sound discretion of the trial court. *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142. In reviewing a trial court's ruling on a motion for a new trial, an appellate court should view the evidence before it favorably to the trial court's action, rather than the jury's verdict, where the trial court's decision involves questions of fact.

*Sanders v. Mt. Sinai Hosp.* (1985), 21 Ohio App.3d 249, 253, 21 OBR 292, 296–297, 487 N.E.2d 588, 593–594; *Richard L. Bowen & Assoc. v. Kassouf* (June 22, 1995), Cuyahoga App. Nos. 66801, 67018, unreported, at 9, 1995 WL 371294. A judgment supported by some competent, credible evidence going to the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Since the trial judge is best able to view the witnesses and observe their demeanor when he weighs the credibility of the offered testimony, there is a presumption that the findings of the trier of fact are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276. The weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact. *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 531 N.E.2d 333.

With these standards in mind, we review appellants' assigned errors.

## IV

In their first assigned error, appellants argue that they are entitled to a new trial because the trial court failed to cure the misconduct of appellee's counsel. Appellants contend that counsel exceeded the bounds of propriety by deliberately attempting to influence the jury when she recited matters that were prejudicial and not at issue in the case. Specifically, appellants complain that appellee's counsel, over objection, was permitted to state that appellants had "made" $18 million and that "profits" were not an issue in the case. Appellants argue that the trial court erred in overruling their objection and in failing to admonish appellee's counsel. We do not agree.

"A reversal of a judgment based upon the misconduct of counsel can only occur when it appears that the misconduct prevented a fair trial." *Vescuso v. Lauria* (1989), 63 Ohio App.3d 336, 340, 578 N.E.2d 862, 864, citing *Ohio & W. Pennsylvania Dock Co. v. Trapnell* (1913), 88 Ohio St. 516, 103 N.E. 761. The determination of whether the bounds of permissible argument have been exceeded is initially within the discretion of the trial court and will not be reversed unless that discretion is abused. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313. The determination of whether the misconduct of the attorney is sufficient to prejudice a jury is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Worthington City Schools v. ABCO Insulation* (1992), 84 Ohio App.3d 144, 616 N.E.2d 550.

Upon review of the entire record before us, we find no misconduct on the part of appellee's counsel. Although appellants contend that there is no evidence in the record until the closing argument of counsel as to the $18 million "made"

by Cirrocumulus, the record reveals otherwise. Appelbaum, who testified for appellants, stated that "Cirrocumulus made 18 million dollars in sales." Further, appellants contend that appellee's counsel mischaracterized the $18 million as "profits" in order to mislead or prejudice the jury. A careful reading of the transcript before us fails to reflect any instance where counsel used the offending term "profits." Consequently, we do not find counsel's comments during closing argument to rise to the level of misconduct. Even so, should counsel's comments have been construed as "misconduct," the court properly instructed the jury that final arguments and statements of counsel are not evidence. A jury is presumed to have properly followed the instructions given. *Pang, supra.* Hence, we do not find that the trial court abused its discretion where it failed to order a new trial based upon the alleged misconduct of appellee's counsel.

V

Next, because we find Assignments of Error No. X and XI to be dispositive of other issues in this case, we will address these assignments together. Appellants contend that the trial court erred in its denial of their motion for judgment notwithstanding the verdict pursuant to Civ.R. 50 and their motion for a new trial pursuant to Civ.R. 59(A)(6) and (7) regarding the appellee's status of holder in due course of the promissory note. Specifically, appellants contend that after construing the evidence most strongly in favor of appellee, reasonable minds could only come to the conclusion that appellee was not a holder in due course of the promissory note and that the jury's determination is not sustained by the weight of the evidence and is contrary to law. We do not agree.

R.C. 1303.31(A) states:

"A holder in due course is a holder who takes the instrument:

"(1) For value; and

"(2) In good faith; and

"(3) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

It is undisputed that Star Bank is the holder of the promissory note pursuant to the assignment by Cumulus. Star Bank gave value for the note by releasing its security interest as to the inventory sold pursuant to the promissory note. The jury, by interrogatory, found that Star Bank took the promissory note (1) in good faith and (2) without any notice that it was overdue or had been dishonored or that there was any defense or claim to it on the part of any person.

Appellants challenge the jury's verdict regarding required element that Star Bank took the promissory note in good faith. Appellants contend that Star

Bank's involvement with the underlying transaction is sufficiently close to defeat the Bank's holder-in-due-course status. Appellants rely on *Arcanum Natl. Bank v. Hessler* (1982), 69 Ohio St.2d 549, 23 O.O.3d 468, 433 N.E.2d 204, in which the Ohio Supreme Court held that a transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate that the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated. The *Arcanum* court established five factors indicative of a close connection between the transferee and the transferor:

■ "(1) Drafting by the transferee of forms for the transferor; (2) approval or establishment or both of the transferor's procedures by the transferee * * *; (3) an independent check by the transferee on the credit of the debtor or some other direct contact between the transferee and the debtor; (4) heavy reliance by the transferor upon the transferee * * * and; (5) common or connected ownership or management of the transferor and transferee." *Id.* at 555, 23 O.O.3d at 472, 433 N.E.2d at 210.

■ When we apply the above factors to the facts of the case, we do not find that Star Bank knew or should have known of infirmities in the transaction. While the record reveals that Star Bank worked closely with Cumulus and the crisis manager during the sale of the Memory Module Division, this close connection with the transaction cannot be used to impute knowledge of infirmities of the underlying transaction to Star Bank where no infirmities are shown. In this case, the jury did not find negligent or intentional misrepresentation, fraud in the inducement, or failure of consideration. Further, appellants do not challenge the jury's findings on these issues. Consequently, we do not see infirmities in this transaction that could to be imputed to Star Bank through the alleged close connection.

After construing the evidence most strongly in favor of Star Bank as we must do, we find that reasonable minds could differ on this element; hence, we find that the trial court did not err in its denial of judgment notwithstanding the verdict on the jury's determination of the holder-in-due-course issue. Further, there is competent and credible evidence to support the verdict of the jury, and we find that it was not an abuse of discretion for the trial court to deny appellants' motion for a new trial on this issue.

As a holder in due course of the promissory note, Star Bank took the instrument free from all Cirrocumulus's defenses. R.C. 1303.34 provides:

"To the extent that a holder is a holder in due course he takes the instrument free from:

"(A) all claims to it on the part of any person; and

"(B) all defenses of any party to the instrument with whom the holder has not dealt except:

"(1) infancy, to the extent that it is a defense to a simple contract; and

"(2) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

"(3) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

"(4) discharge in insolvency proceedings; and

"(5) any other discharge of which the holder has notice when he takes the instrument."

Hence, Star Bank took the promissory note free of Cirrocumulus's alleged defenses, which it would have against Cumulus.

■■■ Appellants' Assignments of Error Nos. II, III, IV, V, VI, VII, VIII and IX relate to alleged errors made by the trial court that go to appellants' claims for recoupment based upon the defenses they would have against Cumulus on the promissory note. Star Bank being a holder in due course of the promissory note and having thus taken the note free of Cirrocumulus's defenses, any error regarding the defenses presented at trial would be harmless error. Consequently, Assignments of Error Nos. II, III, IV, V, VI, VII, VIII and IX, which relate to the alleged defective inventory and the clerical error on the promissory note, are rendered moot by our determination that the trial court did not err when it did not disturb the verdict of the jury in its determination that Star Bank was a holder in due course of the promissory note. Whether Cirrocumulus could or could not prove its defenses will not matter where Star Bank has been shown to be a holder in due course and, therefore, to have taken the promissory note free of the defenses it would have had against Cumulus.

## VI

In their twelfth and thirteenth assignments of error, appellants contest the decision of the court granting Star Bank's motion for prejudgment interest.

R.C. 1343.03(A) governs an award for prejudgment interest and provides:

"Except as provided in division (C)(2) of this section, in cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all

verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, except that, if a written contract provides a different rate of interest in relation to the money that becomes due and payable, the creditor is entitled to interest at the rate provided in the contract."

"Prejudgment interest * * * imposes a civil sanction against a party who holds money to its own use against the lawful claim of the other party which claim is not seriously disputable. In other words, this statute removes some of the advantages of delay for a stakeholder * * * who continues to be able to use money which should be paid to another solely because of the deliberative process." *Mills v. Dayton* (1985), 21 Ohio App.3d 208, 209, 21 OBR 222, 223, 486 N.E.2d 1209, 1211. An award of prejudgment interest will be upheld absent an abuse of discretion. *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572.

First, appellants challenge the trial court's grant of prejudgment interest on the verdict against them. Specifically, in reliance on *Maintenance Unlimited, Inc. v. Salemi* (1984), 18 Ohio App.3d 29, 18 OBR 54, 480 N.E.2d 113, appellants contend that prejudgment interest pursuant to R.C. 1343.01(A) may not be awarded against a party who is not in privity. Appellants contend that they are not in privity with Star Bank and that their alleged liability arises not by agreement but by operation of law. We do not agree.

Appellants' reliance on *Salemi* is misplaced. The *Salemi* court held that the action in the case arose "not under a verbal contract, but by operation of law. Thus, R.C. 1343.03(A) is not applicable, and the appellee is not entitled to prejudgment interest." *Salemi*, 18 Ohio App.3d at 34, 18 OBR at 59, 480 N.E.2d at 119. Here, the matter is based upon recovery pursuant to contract and not by a relationship of the parties that arose as a matter of law. It is uncontested that Cumulus and Cirrocumulus were in privity of contract, and, therefore, Cumulus would have had the right to prejudgment interest for sums due and owing on both the promissory note and the asset purchase agreement should Cumulus have prevailed in an action against Cirrocumulus. However, Cumulus assigned to appellee Star Bank all of its rights, benefits, and remedies under both the promissory note and the asset purchase agreement. As a general rule, an assignee stands in the shoes of the assignor with respect to the subject of the assignment, having the same rights and remedies. *Inter Ins. Exchange of Chicago Motor Club v. Wagstaff* (1945), 144 Ohio St. 457, 460, 30 O.O. 44, 45, 59 N.E.2d 373, 375. "[O]ne is in privity with another if he succeeds to an estate or interest formerly held by the other * * *; because privity is a succession of interest or relationship to the same thing." *Columbus v. Union Cemetery* (1976),

45 Ohio St.2d 47, 51, 74 O.O.2d 79, 81, 341 N.E.2d 298, 301. Consequently, we hold that the rights and benefits assigned by Cumulus to Star Bank include the right to collect the stated interest on sums due and owing. The rights of Star Bank to the interest due to it on the principal sums owed arose from contract and not by operation of law. Accordingly, we find that the trial court did not abuse its discretion in granting prejudgment interest to Star Bank.

Finally, appellants argue in their thirteenth assigned error that appellee failed to sustain its burden to establish the date on which the instruments became due and, therefore, the court calculated the interest due from the incorrect date.

■ Where money becomes due under a contract that stipulates the amount to be paid, interest accrues from the time that the money due should have been paid. *Braverman v. Spriggs* (1980), 68 Ohio App.2d 58, 22 O.O.3d 47, 426 N.E.2d 526.

■ The trial court did not err in determining that the prejudgment interest on the promissory note runs from February 10, 1993. Pursuant to the terms of the promissory note, Cirrocumulus was required to pay Star Bank $25,000 per week. The total of the payments made when applied to the $25,000 requirement covers the weeks up to February 2, 1993. Accordingly, as of February 9, 1993, Cirrocumulus failed to make its next due and owing $25,000 payment. Therefore, Star Bank is entitled to interest on the outstanding amount due on the promissory note from February 10, 1993.

■ However, pursuant to the purchase agreement, Section 3(d), "[p]ayments of the Non-competition and Consulting Amounts, if any, will be due concurrently with seller's receipt of the monthly non-competition and consulting statement." Section 3(h) of the agreement provides as follows:

"In the event that the aggregate Non-competition and Consulting Amounts paid during the guaranty period are less than the guaranteed amount (the 'Non-competition Deficit'), Purchaser will pay the seller the amount of such non-competition deficit on the last Friday of November, 1993."

The plain language of the agreement shows that the $250,000 became due and owing on the last Friday of November 1993. The agreement is silent as to any interest that Cirrocumulus would be required to pay upon any deficit amount.

Therefore, from the documents before us, we conclude that the amount of prejudgment interest due and owing to Star Bank for the amount owed by Cirrocumulus on the noncompetition and consulting agreement should be calculated from November 26, 1993. Appellant's thirteenth assignment of error is well taken in part, and we modify the amount of the prejudgment interest to reflect

the accrual of interest on the amounts due on the noncompetition agreement as of November 26, 1993 to be $51,735.56.

The judgment of the trial court is affirmed as modified.

*Judgment affirmed as modified.*

MATIA, P.J., and PATTON, J., concur.

ROBERT E. HOLMES, J., retired, of the Supreme Court of Ohio, sitting by assignment.