Plaintiff-appellant Ralph Harris ("appellant"), individually and as the administrator of the estate of his wife, Donna K. Harris, deceased ("the decedent"), appeals from the jury verdict in favor of defendant-appellee Syed J. Ali, M.D. ("Dr. Ali") on appellant's medical malpractice claims. Appellant also appeals from the trial court's order granting a directed verdict in favor of Dr. Ali on appellant's claim for lack of informed consent. Appellant assigns the following errors for our review:
 I. THE TRIAL COURT COMMITTED ERROR IN ENTERING JUDGMENT UPON A VERDICT WHICH WAS IMPROPER AND CONTRARY TO THE LAW AND THE EVIDENCE WHERE THE DEFENDANT-APPELLEE COMMENCED SURGERY WITHOUT FIRST ACQUIRING THE RESULTS OF HIS ORDERED X-RAY.
 II. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE TRIAL COURT COMMITTED ERROR IN RENDERING JUDGMENT FOR DEFENDANT-APPELLEE WHERE THE DEFENDANT-APPELLEE EMBARKED UPON A SURGICAL PROCEDURE FOR WHICH DEFENDANT-APPELLEE WAS NOT TRAINED, THUS VIOLATING THE STANDARD OF DUE CARE REQUIRED TO PLAINTIFF'S-DECEDENT.
 III. THE COURT COMMITTED ERROR OF LAW TO THE PREJUDICE OF PLAINTIFF'S-DECEDENT IN GRANTING A DIRECTED VERDICT TO THE DEFENDANT-APPELLEE AS TO INFORMED CONSENT.
Finding appellant's assignments of error to lack merit, the judgment of the trial court is affirmed.
 I.
In 1989, the decedent was diagnosed with breast cancer. On or about June 29, 1989, Dr. Ali performed a radical mastectomy on the decedent's left breast. Following the mastectomy, the decedent underwent a course of chemotherapy, which was administered by her primary oncologist, M. Ali Tirgan, M.D.
Initially, the decedent received chemotherapy through her peripheral veins. By 1991, however, the decedent's peripheral veins were no longer a viable conduit for her treatment. Dr. Tirgan recommended that the decedent undergo the surgical implantation of a right chest catheter, known as a port-a-cath, which would be used for the injection of the decedent's chemotherapy.
Dr. Ali surgically inserted a catheter in the decedent's right chest, and Dr. Tirgan began administering the decedent's chemotherapy utilizing the catheter. Eventually, however, Dr. Tirgan recommended that the decedent undergo a fluoroscope examination because her chemotherapy was not getting through the catheter. On January 9, 1992, a fluoroscope examination was performed by Community Hospital of Bedford's director of radiology, Ronald A. Bailey, M.D. According to Dr. Bailey, the fluoroscope examination indicated that the catheter was "blocked" and completely out of the host vein.
The decedent was again referred to Dr. Ali for the surgical removal of the "blocked" tubing and insertion of a new catheter. Dr. Ali ordered a pre-operative x-ray of the decedent's right chest, which was taken on January 23, 1992.
On January 24, 1992, prior to obtaining the results of the decedent's right chest x-ray, Dr. Ali surgically removed the original catheter. Then, after three or four failed attempts to insert a replacement in the decedent's right chest, Dr. Ali successfully implanted the second port-a-cath in the left chest area.
As Dr. Ali was concluding this procedure, he received the results of the decedent's right chest x-ray; the radiology report clearly demonstrated that the distal portion of the original port-a-cath had fractured and was lodged in the decedent's right atrium prior to the surgery.
The decedent contracted pneumonia, and was hospitalized at Community Hospital of Bedford from January 20, 1992, to February 5, 1992. On March 5, 1992, the decedent returned to Community Hospital of Bedford and, on March 6, 1992, she was transported to St. Luke's Hospital, where an unsuccessful attempt was made to remove the remaining piece of the original port-a-cath. On March 13, 1992, the piece of tubing was successfully removed from the decedent's heart during a procedure at the Cleveland Clinic Foundation).[1]
On December 10, 1992, the decedent filed a medical malpractice complaint against Dr. Ali in the Cuyahoga County Court of Common Pleas. The decedent died of breast cancer five days later, on December 15, 1992. Appellant voluntarily dismissed the decedent's original complaint on February 1, 1995. On January 31, 1996, appellant refiled the underlying medical malpractice action.
On July 1, 1997, the trial of the underlying case commenced. Appellant presented the testimony of five witnesses, including his medical expert witness, Clarence Huggins, M.D.[2] Dr. Ali presented three witnesses, including his expert witness, Dr. Gary Williams. In addition, Dr. Ali called Cynthia Marie Zito, an oncology nurse involved in the decedent's care and treatment, and Dr. Ali testified in his own defense.
The trial was a classic battle of the experts. Dr. Huggins opined that Dr. Ali's care and treatment of the decedent relating to the surgery on January 24, 1992, fell below the requisite standard of care. Specifically, Dr. Huggins insisted that Dr. Ali was negligent in performing the surgery without first obtaining and reviewing the chest x-ray which was taken the previous day. Dr. Ali and his expert, Dr. Williams, testified that his dare and treatment of the decedent was appropriate.
Based upon the evidence presented, Dr. Ali moved for a directed verdict. The trial court granted a directed verdict in favor of Dr. Ali on appellant's claim for lack of informed consent. On July 3, 1997, the jury returned a verdict in favor of Dr. Ali on appellant's remaining claims. On July 8, 1997, the trial court entered judgment on the jury verdict.
On July 22, 1997, appellant moved for a new trial. In a journal entry filed on September 30, 1997, the trial court denied appellant's motion for a new trial. On October 30, 1997, appellant filed the instant appeal.
 II.
In his first and second assignments of error, appellant argues in effect that the jury verdict was against the manifest weight of the evidence.
A judgment supported by some competent, credible evidence going to the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. The weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact. Star Bank Nat'l. Assn. v. Cirrocumulus Ltd. Partnership
(1997), 121 Ohio App.3d 731, 744, citing Shore, Shirley Co. v.Kelley (1988), 40 Ohio App.3d 10. Because the trial judge is best able to view the witnesses and observe their demeanor when he weighs the credibility of the offered testimony, there is a presumption that the findings of the trier of fact are correct.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
In Bruni. v. Tatsumi (1976), 46 Ohio St.2d 127, the Ohio Supreme Court established the elements of a medical malpractice claim:
 In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.
Id. at syllabus.
Appellant argues that the evidence presented at trial clearly demonstrated that Dr. Ali's medical treatment of the decedent relating to her surgery on January 24, 1992, fell below the recognized standard of care. In his first assignment of error, appellant argues that Dr. Ali was negligent in commencing the surgery without first obtaining and reviewing the chest x-ray which was taken on January 23, 1992. The x-ray results confirmed that the original port-a-cath was fractured, and not "blocked" as earlier diagnosed. In his second assignment of error, appellant claims that Dr. Ali was negligent in embarking upon the surgical removal of the fractured port-a-cath because he was not trained to perform such a procedure.
Appellant's contentions are based upon the testimony of his medical expert witness, Dr. Huggins. According to Dr. Huggins, Dr. Ali was negligent in performing the surgical removal of the original port-a-cath on January 24, 1992. In addition, Dr. Huggins testified that the decedent contracted pneumonia as a result of the remaining piece of tubing lodged in her heart, the remaining piece of the port-a-cath necessitated the decedent undergo two removal procedures before it was successfully retrieved, and these procedures and the decedent's pneumonia resulted in extended hospitalizations.
Appellant's contentions completely ignore the testimony of Dr. Ali and his medical expert witness, Dr. Gary Williams. According to Dr. Ali and Dr. Williams, Dr. Ali's care and treatment of the decedent was within the requisite standard of care. Specifically, both doctor's testified that Dr. Ali was not negligent in proceeding with the removal of the original port-a-cath without first having read the right chest x-ray.[3] In addition, neither Dr. Ali nor Dr. Williams found any fault in Dr. Ali performing a procedure in which he believed he was removing a "blocked" catheter.
Finally, we note that both Dr. Ali and Dr. Williams testified that the fractured piece of tubing was lodged in the decedent's heart prior to the January 24, 1992 operation. The broken piece of the port-a-cath is clearly visible in the x-ray taken on January 23, 1992. In addition, both Dr. Ali and Dr. Williams testified that the fractured piece of tubing did not cause the decedent's pneumonia. In summary, according to Dr. Ali and Dr. Williams, the injuries complained of were not caused by the allegedly negligent actions of Dr. Ali.
During the trial, the jury was presented with conflicting evidence primarily through the parties' medical expert witnesses. The jury heard conflicting opinions in this case, and decided that Dr. Ali and his medical expert witness, Dr. Williams, were more credible. Because there was competent, credible evidence to support the jury's verdict, this court will not second guess their findings.
Accordingly, appellant's first and second assignments of error are without merit.
 III.
As for his final assignment of error, appellant contends that the trial court erred when it granted Dr. Ali's motion for a directed verdict on appellant's claim for lack of informed consent.
Civ.R. 50 (A) (4), which provides the standard for directing a verdict, states:
 When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
A directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential elements of his claim. Glover v. Boehm Pressed Steel Co. (1997), 122 Ohio App.3d 702,709, citing Cooper v. Grace Baptist Church (1992),81 Ohio App.3d 728, 734. A motion for a directed verdict tests the legal sufficiency of the evidence to take the case to the jury, and therefore presents a question of law, not one of fact. SeeWagner v. Midwestern Indemn. Co. (1998), 83 Ohio St.3d 287, 294.
In Nickell v. Gonzalez (1985), 17 Ohio St.3d 136, the Supreme Court of Ohio established the elements for the tort of lack of informed consent:
 The tort of lack of informed consent is established when:
 (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
 (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
 (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.
Id., at syllabus. See also Zarlinga v. Lampert (Feb. 26, 1998), Cuyahoga App. No. 72294, unreported.
In order to prevail on a claim for lack of informed consent, medical expert testimony is necessary to establish the significant risks which would have been disclosed to support the plaintiff's claim since the probability and magnitude of those risks is a matter of medical judgment beyond the knowledge of the lay person. Ratcliffe v. University Hospitals of Cleveland (Mar. 11, 1993), Cuyahoga App. No. 61791, unreported, citing Ware v.Richey (1983), 14 Ohio App.3d 3, 7. See also Bedel v. Univ.OB/GYN Assoc., Inc. (1991), 76 Ohio App.3d 742, 744 ("Generally, the plaintiff has the burden of proving by expert medical evidence what a reasonable medical practitioner of the same discipline, practicing in the same or similar communities under the same or similar circumstances, would have disclosed to his patient about the risks incident to a proposed treatment, and of proving that the physician departed from that standard.");Ratcliff v. Morehead (May 19, 1998), Scioto App. No. 97CA2505, unreported.
In the instant case, appellant based his claim of lack of informed consent on the assertion that Dr. Ali failed to appreciate that there was a fractured piece of the original port-a-cath lodged in the decedent's heart prior to the surgery on January 24, 1992. In addition, Dr. Ali failed to disclose the existence of the tubing fragment to the decedent even after the surgery. However, appellant failed to present expert opinion testimony on the essential elements of his lack of informed consent claim.
We find that the trial court did not err in granting Dr. Ali's motion for a directed verdict on appellant's claim for lack of informed consent because there was insufficient evidence to present the claim to the jury. Accordingly, appellant's third assignment of error is overruled.
The judgment of the trial court is affirmed.
It is ordered that appellee recover of appellants his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES M. PORTER, ADM. J. and MICHAEL J. CORRIGAN. J.CONCUR.
 ___________________________________ LEO M. SPELLACY JUDGE
N.B. This entry is an announcement of the court's decision. See App.R. 22 (B), 22 (D) and 26 (A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22 (E) unless a motion for reconsideration with supporting brief, per App.R. 26 (A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22 (E). See, also S. Ct. Prac. R. II, Section 2 (A) (1).
[1] The removal process consisted of "worming" a wire hook through the groin to the right atrium, and "snarring" and removing the remaining piece of the port-a-cath.
[2] Appellant presented the following fact witnesses: (1) Barbara Thomas, the decedent's mother-in-law; (2) Bambi Lesley, a friend of the decedent; and (3) Ralph Harris [appellant], the decedent's husband. In addition, appellant called Dr. Ali, upon cross-examination.
[3] Dr. Ali testified that the x-ray taken on January 23, 1992, was not a necessary prerequisite to the surgery the next day. Dr. Ali noted the following: (1) the fluoroscope evaluation which was taken on January 9, 1992, indicated that the catheter was blocked; (2) a fluoroscope evaluation is usually more accurate than an Xray; and (3) he had no reason to doubt the fluoroscope results and corresponding diagnosis by Dr. Bailey and Dr. Tirgan.
Moreover, Dr. Ali indicated that his decision to order the right chest x-ray was a mere formality, pursuant to a hospital policy with the underlying purpose of avoiding medical malpractice lawsuits against the hospital and its doctors.